# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

EARNEST D. BEAMON, Jr.,

     **Plaintiff,**

  v.          Case No. 15-CV-560

WILLIAM POLLARD, et al.,

     **Defendants.**

# ORDER

   Earnest Beamon, a Wisconsin state prisoner who is representing himself, filed a complaint under 42 U.S.C. § 1983 alleging that the defendants violated his civil rights at the Waupun Correctional Institution ("Waupun"). Judge Rudolph Randa, who was assigned to the case at the time, screened Beamon's complaint and allowed him to proceed with First and Fourteenth Amendment claims against William Pollard, Tony Meli, John O'Donovan, and Jason Rosenthal. (ECF No. 12.) The case was subsequently reassigned to this court upon the consent of the parties.

   The parties have filed cross-motions for summary judgment. (ECF Nos. 35, 45.) Beamon also filed a motion to appoint counsel. (ECF No. 53.) And the defendants also

filed a motion for leave to file additional supplemental proposed findings of fact. (ECF No. 62.) The motions have been fully briefed and are ready for resolution.

## THE DEFENDANTS' MOTION FOR LEAVE TO FILE
## SUPPLEMENTAL PROPOSED FINDINGS OF FACTS

On September 30, 2016, the defendants filed a motion for leave to file supplemental proposed findings of fact. (ECF No. 62.) They explain that Beamon filed a brief in "response" (ECF No. 58) to their reply brief in support of their motion for summary judgment. (ECF No. 62 at 1.) Beamon's "response" discusses correspondence between him and Kelli R. Willard West, the religious practices coordinator for the Department of Corrections. (*Id*.) The defendants ask to supplement their proposed findings of fact with information from West. (*Id*. at 2.) Beamon opposes the motion, stating that there is nothing new about his correspondence with West. (ECF No. 70.)

The local rules of this district provide that briefing on summary judgment motions consists of one brief in support of the motion, one brief in response, and one brief in reply. *See* Civ. L. R. 56 (E.D. Wis.). A party that seeks to file a "response" to a reply brief, *i.e.*, a sur-reply, must request permission from the court. *See id*. Beamon did not request permission to file his sur-reply. Nevertheless, the court will consider the sur-reply. As a result, it will also consider the defendants' supplemental proposed findings of fact. Accordingly, the court will grant the defendants' motion for leave to file supplemental proposed findings of fact.

# RELEVANT FACTS

The court primarily takes the facts from the defendants' reply to the plaintiff's response to the defendants' proposed findings of fact (ECF No. 55) and from Beamon's sworn complaint (ECF No. 1), which the court construes as an affidavit at the summary judgment stage. *Ford v. Wilson,* 90 F.3d 245, 246-47 (7th Cir. 1996). Where in disputing the defendants' proposed findings of fact Beamon fails to cite evidentiary material, the fact is deemed admitted for purposes of summary judgment. *See* Civ. L. R. 56(b)(2)(B) and (b)(4) (E.D. Wis.).

Beamon's "proposed findings of fact" (ECF No. 47) does not actually state, or propose, any facts. Instead, it is a list of the evidence he contends supports his motion for summary judgment, including Beamon's "statement" (ECF No. 47-1 at 7-10), three of his own affidavits (*id.* at 12-13, 38-49, 61-64), the affidavit of Sherry Thompson (Beamon's sister) (*id.* at 14-15), and the affidavit of Ager Nell Beamon (Beamon's mother) (*id.* at 16-17). Beamon also provides two more of his own affidavits (ECF Nos. 57, 67), three of his own sworn declarations (ECF Nos. 50, 68, 72), the sworn declaration of fellow inmate Kajuan Barksdale (ECF No. 51), and the affidavit of fellow inmate Elbert Compton (ECF No. 52). The court cites directly to these documents where used.

Waupun Correctional Institution is a maximum-security institution located in Waupun, Wisconsin. (ECF No. 55, ¶ 2.) The defendants were staff members at Waupun at all times relevant. (*Id.*, ¶¶ 3-10.) William Pollard was the Warden (*id.*, ¶ 4), Anthony

Meli was the Security Director (*id.* ¶ 6), Jason Rosenthal was a Correctional Officer (*id.*, ¶ 9), and John O'Donovan was a Captain (*id.*, ¶ 3).

Cynthia Radtke (not a defendant) is employed at Waupun as a Supervising Officer 2 (Captain). (*Id.*, ¶ 11.) Radtke also served as the Security Threat Groups Coordinator at Waupun. (*Id.*, ¶ 12.) A security threat group is a group of individuals which threatens, intimidates, coerces or harasses others, or engages in activities which violate or encourage the violation of statutes, administrative rules, departmental policies or institution procedures. (*Id.*, ¶ 16.) As the Security Threat Groups Coordinator, Radtke is responsible for tracking disruptive groups and their members in the institution and documenting their activities, reviewing incoming and outgoing mail and property for gang-related content, instructing Waupun staff regarding gang identification and gang management strategies, and assessing ongoing gang activity within the institution. (*Id.*, ¶ 13.)

Inmates at Waupun are prohibited from engaging in any activity or behavior associated with a security threat group. (*Id.*, ¶ 19.) Security threat groups are prohibited within correctional institutions because they threaten the safety of staff and other inmates in ways which include assaults, riots, battery and intimidation, and introduction of contraband into the institution. (*Id.*, ¶ 20.) Security threat groups also undermine prison authority by providing a support system for those taking an oppositional stance to the prison administration. (*Id.*, ¶ 21.)

In Radtke's experience most security threat groups use religion to hide their activity from security detection. (*Id*.) Inmates know that religious rights are protected, so religion is widely used to hide security threat group activity and to express affiliation. (*Id*., ¶ 24.)

The Nation of Gods and Earths (NGE), or the Five Percent Nation, broke away from the Nation of Islam in the 1960s. (*Id*., ¶ 25.) The name Five Percent Nation stems from the group's belief in "Supreme Mathematics," which breaks down the population of the world into three groups: the Ten Percent, the Eighty Five Percent, and the Five Percent. (*Id*., ¶ 26.) The Ten Percent are those who have subjugated most of the world. (*Id*.) They include Caucasian people and others who create and spread the myth of a nonexistent mystery God. (*Id*.) They are described as rich, blood suckers, and slave makers of the poor. (*Id*.) The Eighty Five Percent are those who are subjugated and deceived. (*Id*.) They are easily led in the wrong direction and are hard to lead in the right direction. (*Id*.) Finally, the Five Percent are African Americans who have achieved self-knowledge. (*Id*.) They know the African American man's true nature and that God is within the black man himself. (*Id*.) Followers believe that the black man is a living, breathing God. (*Id*.) Male members of the group are referred to as "Gods" and female members are referred to as "Earths." (*Id*.) As a result, the group often refers to itself as "The Nation of Gods and Earths." (*Id*.) Members communicate through the "Supreme Alphabet," a system in which numbers correlate to certain letters. (*Id*., ¶ 35.)

NGE preaches that Caucasians were created using genetics of the devil, therefore all white people are inherently evil. (*Id.*, ¶ 28.) The Department of Corrections has identified NGE as a security threat group. (*Id.*, ¶ 30) As a result, inmates are prohibited from possessing NGE literature and symbolism, showing affiliation or allegiance to NGE, or engaging in activities related to NGE. (*Id.*) Inmates who violate this prohibition are subject to discipline. (*Id.*)

Beamon is an African American inmate who says he follows the teachings of the Nation of Islam and the Moorish Science Temple of America. (ECF No. 1, ¶ 11.) Beamon's "Religious Preference Form" identifies "Islam" as the faith he prefers. (ECF No. 39-6.) The Department of Corrections does not consider Islam, the Nation of Islam, or the Moorish Science Temple of America a security threat group. (*See* ECF No. 55, ¶ 34.)

On October 2, 2013, the Department of Corrections transferred Beamon from Redgranite Correctional Institution ("Redgranite") to Waupun. (ECF No. 1, ¶ 11.) Upon arriving at Waupun prison staff took Beamon's personal belongings and screened them for contraband, as is standard practice during inmate transfers. (*Id.*) According to Beamon, he arrived straight from the segregation unit at Redgranite, where staff had already been reviewing his belongings for months. (*Id.*, ¶ 12; *see also* ECF No. 68, ¶ 3.) Waupun staff completed their review of Beamon's belongings in about two days and returned the items to him on October 4, 2013. (ECF No. 1, ¶ 11.)

On November 12, 2013, Waupun Correctional Officer Beasley (not a defendant) again took Beamon's "property." (*Id*.) Beamon does not explicitly describe what items comprised his "property" but his other filings make reference to books and different types of written materials, including poems, letters, notepads, and "sovereign citizenship papers." (Beamon "statement," ECF No. 47-1 at 7; Beamon Dec., ECF No. 68, ¶¶ 4-5.) Beamon asked Beasley why she was taking his property. (ECF No. 1, ¶ 11.) According to Beamon, Beasley responded that someone from Redgranite had called to inform Security Director Meli that they had intercepted a letter from Beamon to a Redgranite inmate using words such as "God" and "peace," both of which are associated with NGE. (*Id*.; ECF No. 68, ¶ 3.)

The next day, November 13, 2013, Beasley returned some of Beamon's "property." (ECF No. 1, ¶ 11.) Although the record is not clear what items Beasley returned, the defendants state that Beasley returned all materials "that were not related to NGE." (ECF No. 55, ¶ 37.) Beamon appears to dispute this fact, claiming that Beasley gave him all of his property back, not withholding any. (*See id*.) However, he also states that Beasley told him that she was still reviewing the rest of his "property." (ECF No. 1, ¶ 11.)

A short time later Beamon filled out an interview request slip asking Meli about the rest of his "property." (ECF No. 47-1 at 7.) Radtke, as the Security Threat Groups Coordinator, went to speak with Beamon. (ECF No. 1, ¶ 12.) Beamon told Radtke that

he was trying to better himself through reading and writing from the Nation of Islam and that the items he possessed were not NGE-related material. (*Id.*) Radtke responded to Beamon's interview request by stating that "he had been returned all of the property permitted by Officer Beasley." (ECF No. 55, ¶ 37.)

Beamon contends that sometime in January 2014 Beasley returned more of the "property" that she had taken in November 2013. (ECF No. 1, ¶ 12.) Again it is unclear what Beasley returned. In some statements Beamon states that Beasley returned "all" of his property. (ECF No. 67, ¶ 2; ECF No. 50, ¶ 2.) In another he states that Beasley returned all of his books but that she threw away the "sovereign citizenship papers." (ECF No. 68, ¶¶ 4-5.) In yet another statement Beamon states that Beasley returned everything that she had taken in November 2013 except "78 pieces of paper, 3 books, one legal note pad, and one big green pad," which were never returned. (ECF No. 47-1 at 7.)

Beamon also states that Beasley came to North Cell Hall at that time and "told me what I could have and what I couldn't and I destroyed it right their [sic] torn in pieces and thrown in the trash." (ECF No. 47-1 at 7.) Beamon further states that "CO Beasley told me that I didn't have to do it then but as long as I got rid of it [the unapproved material] and I stated that I just wanted to get it out of the way and I don't have to worry about it anymore." (*Id.*) Radtke similarly recalls that Beasley gave

Beamon a "warning" on NGE material but did not issue a conduct report at that time. (ECF No. 55, ¶ 38.)

Several months later, on July 25, 2014, Waupun staff again searched Beamon's cell and, according to Beamon, took the "same papers" that Beasley had returned in November 2013 and January 2014. (ECF No. 47-1 at 7.) Waupun staff sent the documents to the Waupun Gang Task Force for review. (ECF No. 55, ¶44.) Correctional Officer Jason Rosenthal, a member of the Gang Task Force, reviewed the materials. (*Id*., ¶ 45.) He found eight letters, one of which was drafted by an inmate at Waupun thanking Beamon for dropping "science" on him. (*Id*., ¶ 46.) Dropping science is a term used to describe and reference NGE beliefs. (*Id*.) Rosenthal found several pages which used the words "god," "earth," "Crackers," the "Devil," "Supreme Mathematics," and "Albinos." (*Id*., ¶¶ 45, 47, 49, 51-52.) Some of these documents expressed the view that white people, *i.e.*, "Crackers," the "Devil," and "Albinos," are oppressing black people. (*Id*., ¶ 47, 49-50, 52.)

Rosenthal also found a lined legal pad with writing by Beamon in which he expressed a  manifesto on his views of white people oppressing black people. (ECF No. 55, ¶ 47.) The writing also referenced NGE. (*Id*.) It also referred to "Crackers," a term used to refer to Caucasians and meant as a disrespectful and derogatory term. (*Id*.)

Rosenthal also reviewed several pages that included a poem in which Beamon espoused that the white man is the devil and makes an argument that white people are

the reason that black people are incarcerated or dead due to violence. (*Id.*, ¶ 50.) In another poem Beamon stated that when he has a male child he will indoctrinate him to be a member of the NGE. (*Id.*) Additional papers included definitions for "Supreme Mathematics," which is a fundamental lesson taught to all members of the NGE. (*Id.*, ¶ 51.)

Rosenthal also reviewed a green legal pad with a handwritten manifesto wherein Beamon referred to "Albinos" as a reference to Jews and white people. (*Id.*, ¶ 52.) The writing included arguments for black superiority meshed with NGE beliefs. (*Id.*) Beamon wrote about albino mutants, a teaching of NGE that white people are deemed a lesser race. (*Id.*) Finally, Rosenthal found a page of white lined paper with handwritten letters and numbers. (*Id.*, ¶ 53.) The document included a coded cipher where each letter of the alphabet corresponded to a different number. (*Id.*)

Based on the content of the literature, the manifesto, the letters, and the code sheet, Rosenthal believed that Beamon was distributing NGE materials to other inmates at Waupun. (*Id.*, ¶ 54.) As a result, on July 29, 2014, Waupun staff placed Beamon in temporary lock-up pending a further investigation. (*Id.*, ¶ 55.)

Sometime after July 29, 2014, Beamon filed Inmate Grievance #WCI-2014-15953 stating that the July 25, 2014 cell search was "harassment." (ECF No. 1, ¶ 13.) Waupun staff returned the grievance to Beamon with instructions to speak with Meli to resolve the issue. (*Id.*) Beamon wrote to Meli, who stated that he could not comment on the

issue at that time. (*Id*.) Beamon re-submitted his inmate grievance on August 12, 2014. (*Id*.)

Two days later, on August 14, 2014, Rosenthal prepared Conduct Report #2423051 against Beamon for group resistance and petitions, disrespect, possession of contraband, and violations of policies and procedures. (ECF No. 55, ¶ 56.) The next day, Security Threat Group Specialist Bret Mierzejewski (not a defendant) conducted a preliminary review of the conduct report. (*Id*., ¶ 57.) He noted that the material in Beamon's cell included racist ideologies, including terms such as "Devil" and "Albino" in reference to white people. (*Id*.) Mierzejewski also noted that information from interviews with several inmates at Waupun implicated Beamon in disseminating NGE literature for recruitment. (*Id*.) Mierzejewski concluded that the conduct report was supported by evidence. (*Id*.)

On August 18, 2014, Captain Thomas Core (not a defendant) approved the conduct report for further processing. (*Id*., ¶¶ 62-64.) Beamon received a copy of the conduct report and requested Radtke, Rosenthal, and inmate Bizzle to serve as witnesses at his disciplinary hearing relating to the conduct report. (*Id*., ¶¶ 63, 66-67.)

On September 2, 2014, defendant John O'Donovan held a disciplinary hearing relating to Conduct Report #2423051. (*Id*., ¶ 70.) Rosenthal and Bizzle appeared at the hearing. (*Id*., ¶ 67.) Radtke did not appear but provided a written statement answering a question posed by Beamon. (*Id*., ¶¶ 67-68.) Beamon states that prior to the disciplinary

hearing O'Donovan and Rosenthal "were cracking jokes and laughing with each other" and that O'Donovan stated to Rosenthal that "he should make SGT for this one." (ECF No. 48 at 1.)

At the hearing Beamon asked Rosenthal questions which sought to distinguish NGE beliefs from Nation of Islam beliefs. (ECF No. 39-1 at 28.) Rosenthal answered the questions and stated that he did not confuse NGE beliefs with the beliefs of the Nation of Islam. (ECF No. 55, ¶ 73.) Beamon asked Radtke to answer the following question: "[d]id you know that the NOI and NGE have the same teachings? Yes or No." (ECF No. 39-1 at 33.) Radtke submitted a statement by email indicating that NGE and Nation of Islam are not the same organization, do not have similar teachings, and that Beamon was attempting to confuse the two by claiming that NGE is an "off-shoot" of the Nation of Islam. (*Id*.)

Beamon submitted a statement from inmate Bizzle which indicated that Beamon usually kept to himself. (ECF No. 55, ¶ 76; ECF No. 39-1 at 27.) Finally, Beamon provided his own statement swearing that the documents from his cell had "nothing to do with NGE." (ECF No. 55, ¶ 71.) He further stated that he was writing a book and that Rosenthal had "misconstrued" all of the words from those documents. (*Id*.)

O'Donovan reviewed Rosenthal's statement in the conduct report, the testimony of the staff members, Beamon's testimony, Bizzle's testimony, and the physical evidence found in Beamon's cell. (*Id*., ¶ 79.) O'Donovan found that Rosenthal's statement in the

conduct report, and the testimony of the staff members, were credible because Rosenthal and Radtke had no vested interest in the outcome of the hearing. (*Id.*, ¶ 77.) Further, there was no physical evidence corroborating Beamon's statement that he was writing a book and, to the contrary, all the physical evidence found in his cell clearly referred to "5%" and the "Nation of Gods and Earths." (*Id.*) O'Donovan noted that Beamon was charged with possessing gang related material and that he could not justify possessing gang related material by stating that the Nation of Islam uses the same terminology. (*Id.*) As a result, O'Donovan concluded that it was more likely than not that Beamon possessed gang-related NGE materials, and found Beamon guilty of the charges in the conduct report. (*Id.*, ¶¶ 77, 86.) Beamon received 270 days of disciplinary segregation, 135 of which he served. (ECF No. 55, ¶ 86; ECF No. 49, ¶¶ 86-87.)

Beamon appealed O'Donovan's decision to Pollard. (ECF No. 1, ¶ 19.) Pollard affirmed O'Donovan's decision, concluding that Beamon's 2013 conduct report from Redgranite for possession of NGE-related materials justified the punishment. (*Id.*)

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A.*,

*Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

A party asserting that a fact is genuinely disputed, or not disputed, must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

### A. First Amendment

Beamon's First Amendment claims arise from three specific incidents at Waupun. Beamon's free speech and free exercise claims stem from Beasley confiscating written materials from Beamon's cell on November 12, 2013 and July 25, 2014. His

retaliation claim stems from Rosenthal issuing a conduct report shortly after Beamon filed an inmate grievance.

Beamon also attempts to assert new allegations of "retaliation" from Redgranite staff. The court will not address those claims here as Redgranite staff are not defendants in this case and Beamon was not allowed to proceed with such claims at screening. (*See* ECF No. 12). The court also will not address issues related to the Religious Land Use and Institutionalized Persons Act ("RLUIPA") as Beamon at screening also was not allowed to proceed with such a claim.

**1. Free Speech and Free Exercise**

The First Amendment of the United States Constitution protects an individual's right to free speech and to the free exercise of religion. U.S. Const. amend. I. Freedom of speech implies the freedom to read, and inmates have a right to access the "marketplace of ideas and opinions that it is the purpose of the free-speech clause to protect." *Toston v. Thurmer*, 689 F.3d 828, 831 (7th Cir. 2012) (quoting *King v. Federal Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005)). Free exercise of religion allows inmates to follow their faith and "prohibits the state from imposing a 'substantial burden' on a 'central religious belief or practice.'" *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013) (quoting *Hernandez v. Comm'n of Internal Revenue*, 490 U.S. 680, 699 (1989)).

Lawful incarceration, however, "brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations

underlying our penal system." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)). As a result, an inmate's First Amendment rights are sharply circumscribed by restrictions that are reasonably related to legitimate penological interests. *Tarply v. Allen Cnty., Ind.*, 312 F.3d 895, 898 (7th Cir. 2002); *Turner v. Safley*, 482 U.S. 78, 89-91 (1987). In deciding whether restrictions are reasonably related to legitimate penological interests, the court considers four factors: (1) whether a valid, rational connection exists between the policy and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question that remain available to prisoners; (3) whether accommodation of the asserted constitutional right would have a negative impact on guards, other inmates, and the allocation of prison resources; and (4) whether obvious, easy alternatives exist as evidence that the regulation is not reasonable. *Turner*, 482 U.S. at 89-91.

Beamon states that he was "engaged in protected speech" and was using "religious jargon" when he used terms such as "god," "earth," "Crackers," the "Devil," "Supreme Mathematics," and "Albinos" in the written materials found in his cell. (*See* ECF No. 46 at 2, 9.) He explains that he copied these words from a prison library book as "research" for his own book, and the terms are "slang terms used in every urban community across the world" to express black identity. (*Id*. at 9; ECF No. 1, ¶ 14.) He

also explains that he follows the teachings of the Nation of Islam, a religion that uses terminology similar to but "is not NGE." (ECF No. 46 at 6-7.)

### a. The Government's Legitimate Interest in Prison Safety and Security

The Department of Corrections prohibits inmates from possessing gang-related material. *See* Wis. Admin. Code § DOC 303.24. It has identified NGE as a gang under § DOC 303.24 due to the violence this group has caused in other prisons around the country through its racially motivated teachings. (ECF No. 55, ¶¶ 30-32.) Defendants concluded that the materials found in Beamon's cell were "NGE-related" because of the words, phrases, and symbols it referenced, and they punished him with 270 days disciplinary segregation, 135 of which he served. (*Id.*, ¶ 54.)

The court will assume that the Department of Correction's policy prohibiting inmates from possessing NGE-related material implicated Beamon's First Amendment right to free speech and religion. Nevertheless, defendants have met their burden and shown that the restriction on the possession of NGE-related material is reasonably related to the prison's legitimate penological interests. Defendants provide evidence showing that materials that include the use of words such as "god," "earth," "crackers," the "devil," "supreme mathematics," and "albinos," when used in the context of a discussion about different races, are associated with NGE. (ECF No. 55, ¶¶ 25-29.) Some of these terms are derogatory and intended to be disrespectful towards Caucasians. (*Id.*, ¶ 47.) In Wisconsin's racially diverse prison system, such teachings

increase the likelihood of conflict, violence, and disruption among inmates and against guards, who are predominately white. (*Id*., ¶ 32.)

Further, NGE members use coded language, *i.e.*, the "Supreme Alphabet," to communicate without detection. (*Id*., ¶ 35.) Secret communications pose a security risk at the prison because inmates are able to plan conspiracies, assaults, and escapes. (*Id*.)

Based on the organization's propensity toward violence, and the prison staff's inability to detect and prevent the violence, the court can conclude that the Department of Correction's prohibition on NGE-related literature, terminology, and symbolism, under § DOC 303.24, is directly and rationally related to its interest in prison safety and security. *See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 469-70 (4th Cir. 1999) (concluding that a ban on NGE was reasonably supported by incidents of violence in prisons); *see Fraise v. Terhune*, 283 F.3d 506, 517-18 (3rd Cir. 2002) (concluding that a ban on NGE was justified by the numerous instances of actual or planned violence involving Five Percenters); *see Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105 (6th Cir. 2010) (concluding that the ban on NGE was justified because the group "holds racial supremacist views that has been linked to violence and gang-related activity in other prisons.").

To the extent that Beamon asserts that the defendants "misunderstood" or "misconstrued" the words "albino," "devils," "supreme mathematics," etc., in his written materials, and that his use of the words mean something other than what those

words mean to NGE followers, courts give deference to the judgment and expertise of prison officials in matters concerning the operation of prisons. *See Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005); *see also Bell v. Wolfish*, 441 U.S. 520, 546 (1976). The court relies on the expertise of prison officials who are more familiar with the subject matter than the court. *Id*. After reviewing the evidence, and giving Beamon a chance to respond, O'Donovan concluded that Beamon possessed gang-related material and was justifying his possession of it by claiming that the Nation of Islam (not a security threat group) also uses the same terminology. The court defers to O'Donovan's expertise on the matter and sees no reason to second-guess his conclusion.

Further, as a practical matter courts must allow prison officials to use an objective standard in applying prison rules. Wis. Admin. Code § DOC 303.24 prohibits inmates from possessing materials containing words, phrases, and symbols which are closely associated with NGE. Although an inmate may claim to be using words like those at issue here to express beliefs that have nothing to do with NGE—certainly the words "god," "devil," "earth," and "albinos" are all often used by persons that do not espouse to be members of NGE—prison officials must be allowed to use their experience and expertise to review the context of the language and determine if it poses a security risk at the prison.

Thus, the first *Turner* factor suggests that a valid, rational connection exists between the Department of Correction's policy prohibiting the possession of NGE-

related materials and a legitimate government interest behind the policy—prison safety and security.

> *b. "Alternative Means "of Exercising the Constitutional Right in Question*

> i. Alternative means of practicing religion

As for the second *Turner* factor, Beamon has no alternative means to exercise his right to practice religion according to principles of the NGE. But Beamon claims that he belongs not to the NGE but to the Nation of Islam. To the extent that that is the case, he is free to exercise his right to practice religion according to Islamic principles. The prison has congregate services and study groups for members under the Umbrella Religious Group ("URG"), and Islam is one of the religions in this group. As a result, Beamon can request a religious diet and possess other religious items associated with his faith. He may conduct individual religious observances/rituals in his living quarters and has access to religious books and texts from the library. Beamon may practice his Islamic faith in a variety of ways, including transcribing and memorizing passages, as long as those passages do not reference NGE-related material.

> ii. Alternative means of practicing free speech

Beamon also has alternative means of accessing the "marketplace of ideas and opinions." The prison has a library with books that inmates may borrow to read and discuss ideas and opinions. Inmates also have the option to order books and writing materials from prison-approved catalogues. Beamon's pleadings show that he has had

access to library books, and he explains in his brief that he has been using library books to help him write his own book. Beamon has also ordered books while in prison, and he includes receipts (*see* ECF No. 47-1 at 26-35) of the books he has purchased.

Beamon's argument that he was "punished" for possessing literature that he "copied" from prison-approved library books, is not supported by the evidence he provides. In support of this claim, Beamon presents four pages from a prison library book called "The Rule of Four" which generally discusses coded ciphers. (*See* ECF No. 47-1 at 21-25.) The excerpts make no mention of any of the words or phrases for he was punished, nor do they discuss the "supreme alphabet," the coded cipher for which he was punished. (*See id*.) Therefore, the second *Turner* factor supports a finding that the restriction on possessing NGE-related material is reasonably related to legitimate penological interests.

     *c.*   *Accommodation of the Asserted Constitutional Right*

The third *Turner* factor asks whether accommodation of the asserted constitutional right would have a negative impact on guards, other inmates, and the allocation of prison resources. Accommodating Beamon's request to use terminology that he calls "urban" slang and "religious jargon," but which the prison deems NGE-related, would have a negative impact on guards and other inmates. As discussed above, the terms Beamon seeks to use in his written materials are closely associated with the NGE security threat group and are intended to be disrespectful and

derogatory. Such terminology increases the likelihood of violence and disruption in Wisconsin's diverse prison population. Thus, the third *Turner* factor also supports a finding that the restriction on possessing NGE-related material is reasonably related to legitimate penological interests.

### d. "Easy Alternatives"

Finally, with regard to the fourth factor from *Turner*, the court cannot identify any "easy alternatives" to preventing violence in prison that stems from racial tension other than to ban NGE-related material that uses terminology offensive to certain races.

All four *Turner* factors support a finding that the restriction on possessing NGE-related material is reasonably related to legitimate penological interests. Accordingly, the court will grant summary judgment in favor of the defendants on Beamon's free speech and free exercise claims.

### 2. Retaliation

Beamon further asserts that, because he filed Inmate Complaint #WCI-2014-15953 alleging that Waupun staff "harassed" him about his written materials, Rosenthal, O'Donovan, Pollard, and Meli retaliated against him in different ways. Rosenthal issued Conduct Report #2423051 for group resistance and petitions, O'Donovan found him guilty of the allegations in the conduct report, and Pollard and Meli did nothing to help him.

The First Amendment right to petition the government for redress of grievances includes the right of access to the courts. *Bridges v. Gilbert*, 557 F.3d 541, 553 (7th Cir. 2009). Inmates are entitled to pursue "administrative remedies that must be exhausted before a prisoner can seek relief in court" without the threat of recrimination. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). Thus, a prison official may not retaliate against a prisoner because that prisoner filed a grievance. *Id*.

To prove retaliation, a plaintiff must produce evidence that: (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter protected speech; and (3) his protected speech was a motivating factor in the defendants' actions. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). The plaintiff need not show that retaliation was the only factor that motivated the defendants but must show that it was one motivating factor. *See Woodruff v. Mason*, 542 F.3d 545, 551(7th Cir. 2008) (citing *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006)). If the plaintiff satisfies these elements, the burden shifts to the defendants to show that they would have taken the same action even without any retaliatory motive. *Id*.

Beamon presents several pieces of evidence to show that his filing of Inmate Complaint #WCI-2014-15953 was "at least a motivating factor" in Rosenthal's decision to issue Conduct Report #2423051, O'Donovan's decision to find him guilty, and Pollard's and Meli's decision to do nothing to help him. Beamon presents (a) his sworn complaint (ECF No. 1); (b) four sworn declarations—one from inmate Barksdale and

three of his own declarations (ECF Nos. 50, 51, 68, 72); and (c) three sworn affidavits—one from inmate Compton and two of his own affidavits (ECF Nos. 52, 57, 67).

However, none of the declarations or affidavits are based on anything that Beamon, Barksdale, or Compton actually witnessed. Beamon states, for example, that "security director [Meli] is always notified" of inmate grievances that are filed (ECF No. 50 at 1), "O'Donovan and Rosenthal are friends" (*id*. at 5), and "Muenchow...always tells officers what inmates complain about." (ECF No. 57, ¶ 7). Barksdale and Compton similarly provide statements indicating that prison staff "talk" and give each other "a heads up" when an complaint is filed against them. (ECF Nos. 51-52). However, none of these individuals actually saw or heard Rosenthal, Pollard, or Meli reading or discussing Beamon's grievance. Beamon may speculate that prison staff talk amongst each other, are friends, and know about inmate grievances that are filed, but "mere speculation and conjecture will not defeat a summary judgment motion." *Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 544 F.3d 752, 757 (7th Cir. 2008) (quoting *McCoy v. Harrison,* 341 F3d 600, 604 (7th Cir. 2003)).

Moreover, Rosenthal and Pollard both provide statements swearing that they did not know about Beamon's grievance prior to issuing, and reviewing, his conduct report. (ECF No. 42, ¶ 9 and ECF No. 43, ¶ 26.) Meli provides a declaration stating that he does not recall the incidents giving rise to this claim because he neither issued the conduct report nor had any role in reviewing the conduct report. (ECF No. 40, ¶ 11). Munchow,

the inmate complaint examiner who reviewed Beamon's grievance, states that he did not discuss Conduct Report #2423051 with Rosenthal, O'Donovan, or Pollard. (ECF No. 38, ¶11). Beamon's assertion that Rosenthal, Pollard, and Meli's declarations are all "untrue" (ECF No 50, at 2-3, 5) is not based on credible evidence that the court can rely on at summary judgement.

Finally, Beamon provides no other evidence, for example, through responses to requests for admissions or interrogatories, from which the court can infer that Rosenthal, Pollard, and Meli knew about his inmate complaint. The mere timing of the conduct report, coming as it did shortly after Beamon filed his inmate complaint, is insufficient evidence to survive summary judgment. *See Andonissamy v. Hewlett–Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008)("[M]ere temporal proximity is not enough to establish a genuine issue of material fact" at summary judgment.). Because Beamon cannot show that Rosenthal, Meli, or Pollard knew about his inmate grievance prior to their allegedly "retaliatory" conduct, he cannot establish that a retaliatory purpose was a motivating factor in their conduct.

O'Donovan, on the other hand, did know about Beamon's grievance prior to Beamon's conduct report hearing. (ECF No. 41, ¶ 21). O'Donovan states that he read the grievance prior to the hearing because the document was attached to Beamon's conduct report. (*Id.*)  O'Donovan, however, can meet his burden of showing that Beamon would have been punished regardless of whether he filed his grievance.

O'Donovan reviewed all of the evidence at the disciplinary hearing and concluded that Beamon possessed gang-related NGE material because the documents found in his cell clearly referenced "5%" and "the Nation of Earths and Gods." He considered O'Donovan and Radtke testimony that NGE is a more radical group than the Nation of Islam due to its racially motivated teachings. Beamon further admitted that Beasley had warned him about what types of written materials he could and could not have (*see* ECF No. 47-1 at 7) and he acknowledges that he received a conduct report in 2013 relating to NGE-related material. (ECF No. 1, ¶ 19). The evidence, therefore, shows that O'Donovan punished Beamon for violating a prison rule. As a result, Beamon has not met his burden to show that his protected speech was a motivating factor in O'Donovan's decision to punish him. *See Tate v. Jenkins*, No. 09-CV-169, 2010 WL 3809765, at *9 (E.D. Wis. Sept. 24, 2010) (concluding that the inmate had committed a "legitimate, admitted infraction," and, therefore, defendants met their burden to demonstrate that the inmate would have been punished regardless of improper motive in searching his property.). Consequently, the court will grant summary judgment in favor of the defendants on Beamon's First Amendment retaliation claim.

## B. Fourteenth Amendment: Due Process

Beamon alleges that the defendants violated his Fourteenth Amendment right to due process by failing to provide adequate notice of what constituted gang-related NGE material. Beamon states that he had no way of knowing that the papers he possessed in

July 2014 were NGE-related because Beasley had returned the very "same" set of papers to him earlier that year. He cites *Rios v. Lane*, 812 F.2d 1032, 1038 (7th Cir. 1987), in support of his conclusion.

In *Rios*, the United States Court of Appeals for the Seventh Circuit concluded that an inmate could "reasonably assume" that transcribing "previously authorized information" onto a notecard would not later subject him to serious disciplinary sanctions. 812 F.2d at 1038. The court noted that "[i]t [wa]s undisputed that much of Rios' message was gleaned from a newspaper called The Militant, a publication explicitly authorized by prison officials," and that "it could hardly be anticipated that the simple transcription of previously authorized information on to a notecard" would somehow transform the passage into contraband. *Id*. The court went on to state that "Rios was given no prior warning that his conduct might be proscribed." *Id*. The court distinguished Rios's case from two others, *Meyers v. Alldridge*, 492 F.2d 296 (3d Cir. 1974), and *Hadden v. Howard*, 713 F.2d 1003, 1008 (3d. Cir. 1983), by stating that the plaintiffs in those cases had been warned that their conduct "could be" punished and that they were "on notice" of potential violations. *Id*.

As in *Meyers* and *Hadden*, Beamon was directly warned by Beasley that he could be punished for having literature related to NGE. Unlike Rios, who had no way of knowing that the content of the passage, or transcription of it onto a notecard, would convert the passage into contraband, Beamon knew that possessing material similar to

what was confiscated in November 2013 could result in a conduct report. As a result, Beamon was "on notice" that possessing the type of written material that he had could result in discipline. Thus, the court will grant summary judgment in favor of the defendants on Beamon's Fourteenth Amendment due process claim.

## CONCLUSION

**WHEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for leave to file additional supplemental proposed findings of fact (ECF No. 62) is **GRANTED**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (ECF No. 35) is **GRANTED** and the case is **DISMISSED**; the plaintiff's motion summary judgment (ECF No. 45) is **DENIED**.

**IT IS ALSO ORDERED** that the plaintiff's motion to appoint counsel (ECF No. 53) is **DENIED** as moot.

**IT IS ALSO ORDERED** that the Clerk of Court enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. I may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask me to alter or amend my judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. I cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. I cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

The parties are expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 30th day of January, 2017.

WILLIAM E. DUFFIN
U.S. Magistrate Judge